**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CHERYL MYERS, | CASE NO. 1:21-CV-02381-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Cheryl Myers ("Plaintiff" or "Ms. Myers") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

On March 19, 2019, Ms. Myers filed an application for DIB. (Tr. 103.) She alleged a disability onset date of July 25, 2018. (*Id.*) She alleged disability due to scoliosis, degenerative disc disease of the cervical and lumbar spine, and chronic pain. (*Id.*) Ms. Myer's application

1

was denied at the initial level (Tr. 112) and upon reconsideration (Tr. 126) and she requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 145.)  A telephonic hearing was held before the ALJ on October 20, 2020.  (Tr. 65-101.)

On November 2, 2020, the ALJ issued a decision finding Ms. Myers had not been under a disability within the meaning of the Social Security Act at any time from July 25, 2018 through her date last insured of March 31, 2020.  (Tr. 46-60.)  On October 28, 2021, the Appeals Council denied Ms. Myers' request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)

On December 21, 2021, Ms. Myers filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have fully briefed the case.  (ECF Docs. 8, 9.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Myers was born in 1976 and was 43 years old on the date last insured of March 31, 2020, making her a younger individual under Social Security regulations.  (Tr. 59.)  She had at least a high school education.  (*Id*.)  Ms. Myers had not worked since July 25, 2018, the alleged onset date.  (Tr. 46-47.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

On July 9, 2018, Ms. Myers saw David Hannallah, M.D., complaining of low back pain. (Tr. 296-97.)  Dr. Hannallah noted Ms. Myers had done therapy in the past, had continued with exercises and stretches on her own, and had been working with a chiropractor.  (Tr. 296.)  Dr. Hannallah assessed Ms. Myers as having mechanical back pain; he stated "it seems like she can live with it at this point" but recommended she consider what she does at work and to try to limit

2

activities that bother her.  (Tr. 296-97.)  Dr. Hannallah discussed treatment options with Ms.

Myers, including physical therapy or injection treatments.  (Tr. 296-97.)  Dr. Hannallah wrote a

prescription for physical therapy and recommended an MRI if Ms. Myers' condition worsened or

failed to improve.  (Tr. 297-98.)  A July 31, 2018 Return to Work form from Dr. Hannallah

indicated "we did not take [Ms. Myers] off work – see clinical."  (Tr. 300.)

On August 3, 2018, Ms. Myers met with Katherine Rapp, PA-C, complaining of

persistent back pain, increasing bilateral lower extremity pain, and a newly blunted reflex.  (Tr.

266, 301.)  PA Rapp noted that Ms. Myers had tried physical therapy, time off work, and activity

modification without relief for over six weeks.  (*Id.*)  PA Rapp recommended an MRI of the

lumbar spine for further evaluation and treatment options including therapy, injections, and/or

surgery.  (*Id.*)  The August 15, 2018 MRI showed no central, foraminal, or lateral recess stenosis;

multi-level degenerative disc disease and degenerative spondylolisthesis were present, as was

scoliosis of the lumbar spine with mild discogenic disease at the L4-L5 and L5-S1 level.  (Tr.

267-69, 304-09.)  PA Rapp continued Ms. Myers off work secondary to her persistent pain,

ordered a CT myelogram and bilateral lower extremity EMGs, and referred Ms. Myers to

neurology.  (*Id.*)

An August 28, 2018 EMG was "essentially normal" and presented no electrodiagnostic

evidence of nerve entrapment, lumbosacral plexopathy, lumbar radiculopathy or generalized

peripheral neuropathy.  (Tr. 270-71, 310-11.)  An XR myelogram of the lumbar spine on

September 11, 2018 demonstrated no evidence of central spinal canal stenosis, and no evidence

of instability to flexion or extension.  (Tr. 314-15.)  A CT of the lumbar spine from the same day

showed disc space narrowing at L5-S1, L1-2 and L2-3.  (Tr. 273-74, 316-17.)  The CT was

otherwise normal.  (*Id.*)  At a follow up appointment on September 12, 2018, PA Rapp discussed

the MRI, CT, and EMG results with Ms. Myers, noting that they did not show any nerve compression.  (Tr. 318-19.)  PA Rapp recommended that Ms. Myers follow up with neurology as scheduled on October 4, 2018.  (Tr. 318.)  She noted that possible treatment for the pain from degenerative changes in her lower back included epidural steroid injections.  (*Id*.)

At a consult on October 8, 2018, Patricia Garcia, D.O., noted an abnormal gait, decreased reflexes on the right knee and ankle, and decreased vibratory sense on the left.  (Tr. 275-76.)  Dr. Garcia prescribed 300 mg gabapentin for Ms. Myers' low back pain.  (Tr. 276.)  A CT of the cervical spine dated October 18, 2018 showed mild multilevel discogenic change and mild facet arthropathy, with no fracture or spondylolisthesis.  (Tr. 277-78.)

Ms. Myers also met with Christina Stout, NP on October 8, 2018.  (Tr. 324-44.)  NP Stout indicated Ms. Myers had been on FMLA leave from work and was out of time, and that Ms. Myers requested paperwork indicating disability to extend her FMLA time.  (Tr. 339.)  NP Stout discussed with Ms. Myers that her practice's goal was to help patients be their functional best and declined to perform a disability exam.  (*Id.*)  A note dated October 24, 2022 indicated Ms. Myers sought a referral to neurology for evaluation and to rule out possible multiple sclerosis (regarding her lower extremity pain and numbness).  (Tr. 392.)

On November 28, 2018, PA Rapp noted Ms. Myers had seen two neurologists and had a cervical MRI (but no MRI of the brain).  (Tr. 320.)  On examination, she noted that Ms. Myers was not in any acute distress, but had some paraspinal tenderness in the lumbar spine and had a gait that was slow but reasonable.  (*Id.*)  PA Rapp again recommended epidural steroid injections for her back pain, to which Ms. Myers responded that she wished to think about that treatment before proceeding.  (*Id.*)  PA Rapp discussed a spinal cord stimulator trial with Ms. Myers but

noted it would be difficult given her past fusion.  (*Id.*)  She started Ms. Myers on gabapentin and recommended follow up on an as-needed basis.  (*Id.*)

On April 1, 2019, Ms. Myers attended an appointment with NP Stout.  (Tr. 512-13.)  She complained of persistent back pain, with a change in the last several weeks that included increased pain from her upper back into her neck.  (Tr. 512.)  She reported no change in her continued low back pain.  (*Id.*)  She also reported she could deal with her low back pain by taking 300 mg gabapentin.  (*Id.*)  On examination, Ms. Myers appeared to be in no acute distress and had a slow but reasonable gait and some paraspinal tenderness.  (*Id.*)  Ms. Myers reported episodes of "blacking out," to which NP Stout recommended she follow up with neurology or neurosurgery as to any possible connection to a C1/2 malformation.  (*Id.*)  NP Stout indicated that Ms. Myers' pain flare-up would likely improve with time and conservative treatment.  (*Id.*)  NP Stout prescribed oral steroids and Flexeril, and refilled the gabapentin prescription.  (*Id.*)  She also recommended epidural steroid injections and formal therapy, but Ms. Myers declined.  (*Id.*)

A July 1, 2019 note from Adam Hedaya, M.D., indicated Ms. Myers was on gabapentin three times daily, but continued to have generalized chronic pain.  (Tr. 435-37.)  Dr. Hedaya started Ms. Myers on tramadol and discussed possible injection therapies in the future.  (Tr. 437.)  At follow up on August 7, 2019, Dr. Hedaya noted Ms. Myers was "using the tramadol very very sparingly."  (Tr. 442-43.)  He prescribed Flexeril and referred her to aquatic therapy.  (*Id.*)

On October 11, 2019, Ms. Myers met with rheumatologist Jennifer Lobert, M.D.  (Tr. 450-52.)  Ms. Myers reported continued problems with her right knee and ankle, instability at her left hip, and neck pain.  (Tr. 452.)  She also complained of brain fog and problems with word finding and remembering.  (*Id.*).  She reported five to six hours of sleep per night and naps three or four times per week for two hours each.  (*Id.*).  She also reported gabapentin did not seem to

be helping much, even at a moderate-to-high dosage.  (*Id.*).  On examination, Ms. Myers was well-appearing and in no obvious distress; she had a normal gait and was able to stand easily from a seated position, but with a popping noise from her left hip.  (*Id.*)  Dr. Lobert noted current prescriptions for Flexeril, gabapentin, Lyrica, and tramadol, and assessed Ms. Myers with Hypermobile Ehlers-Danlos syndrome, right ankle pain, polyarthralgia, and sleep disturbance. (Tr. 450.)  With regard to her Ehlers-Danlos syndrome, Dr. Lobert noted that Ms. Myers was researching the most affordable option for an echocardiogram because she lacked insurance coverage.  (Tr. 452.)  Dr. Lobert noted that the polyarthralgia was related to the Ehlers-Danlos syndrome, and reviewed Ms. Myers' symptom profile – including dizziness, fogginess, mood changes, and swelling hands and feet.  (*Id.*)  She discontinued gabapentin, started pregabalin, and ordered a cervical MRI.  (*Id.*)  With respect to Ms. Myers' right ankle pain due to an inversion injury, Dr. Lobert noted that the physical exam was unremarkable and recommended rest, ice, and a home exercise program; imaging would be considered if the symptoms did not resolve within six to eight weeks.  (*Id.*).  As to Ms. Myers' sleep disturbance, Dr. Lobert recommended a sleep study but noted that Ms. Myers could not afford one due lack of insurance; she indicated she would research options for a home sleep study.  (*Id.*)

On December 27, 2019, Ms. Myers met with rheumatologist Emily Littlejohn, D.O.  (Tr. 485-92.)  Her reported symptoms included fatigue, low back pain, and diffuse muscle aches.  (Tr. 485.)  Ms. Myers described her joints giving out—particularly in her hips and low back— limiting her physical activity.  (*Id.*)  Ms. Myers was taking gabapentin for pain, which she stated helped her to sleep and helped with her right-sided sciatica.  (*Id.*)  Ms. Myers stated her lower back pain often woke her up after five hours of sleep.  (*Id.*)

Dr. Littlejohn believed that Ms. Myers was suffering from a central pain syndrome such as fibromyalgia, and also suspected Ms. Myers back pain was due to facet arthropathy of the lower lumbar spine.  (Tr. 489.)  Although some pain could be attributed to Ehlers-Danlos syndrome, Dr. Littlejohn believed Ms. Myers' symptoms were caused by fibromyalgia. (*Id.*)  Dr. Littlejohn increased Ms. Myers' gabapentin dosage and recommended aqua therapy and core strengthening exercises.  (*Id.*)

### 2. Opinion Evidence

#### i. Summit Therapy Functional Capacity Report

On October 30, 2018, Ms. Myers underwent a functional capacity evaluation by Aaron Lantz, MPT, CWCE.  (Tr. 279.)  Mr. Lantz noted significant history of spine issues, including a 1994 fusion from T4-L4 to correct a severe scoliosis.  (*Id.*)  Ms. Myers reported worsening pain symptoms over the past six to eight months; her last day worked was approximately three months earlier, on July 25, 2018.  (*Id.*) Ms. Myers reported pain or difficulty completing certain activities of daily living ("ADLs"), including putting on socks and shoes, cleaning her home, walking for extended periods or over one mile, or driving longer than thirty minutes.  (Tr. 280.)

On examination, Ms. Myers' handgrip strength and fine motor coordination were normal or near normal.  (Tr. 293.)  Ms. Myers demonstrated no specific limitations to sitting or standing, but had difficulty with kneeling and crouching.  (*Id.*)  Mr. Lantz recommended these activities only on an occasional basis.  (*Id.*)  Mr. Lantz observed that Ms. Myers was able to walk for fifteen minutes without rest, and opined that she could lift ten pounds occasionally and five pounds frequently, carry up to fifteen pounds occasionally, and push/pull twenty pounds.  (Tr. 293-94.)  Mr. Lantz further opined Ms. Myers could perform sedentary work.  (Tr. 294.)

### ii.        Treating Providers

On July 26, 2019, Katherine Rapp, PA-C, stated Ms. Myers continued to report too much pain to work.  (Tr. 515.)

In a report dated October 11, 2019, rheumatologist Dr. Lobert listed Ms. Myers' diagnoses of hypermobile Ehlers-Danlos syndrome, fibromyalgia, scoliosis, degenerative disc disease of the cervical spine with suspected cervical instability, and degenerative disc disease of the lumbar spine.  (Tr. 453.)  She reported Ms. Myers has experienced chronic joint pain and subluxations since childhood due to Ehlers-Danlos syndrome, with affected joints including shoulders, elbows, hips, right leg, neck, upper and lower back.  (*Id.*)  Dr. Lobert also noted cognitive impairment due to poor sleep and chronic pain, and dizziness and lightheadedness due to dysautonomia from Ehlers-Danlos syndrome.  (*Id.*)  Flexeril and tramadol were reported to be minimally effective to treat Ms. Myers's pain, gabapentin was discontinued as ineffective, and Dr. Lobert had started Ms. Myers on Lyrica.  (Tr. 454.)  Ms. Myers reported that physical therapy for her lumbar spine and left hip had minimal benefit.  (*Id.*).  Dr. Lobert recommended an MRI of the cervical spine, an echocardiogram, and a sleep study, but reported Ms. Myers had difficulty complying with testing recommendations due to lack of insurance coverage and financial limitations.  (Tr. 453-54.)  With respect to Ms. Myers' physical limitations, Dr. Lobert referred to the Summit Therapy Functional Capacity Report.  (*Id.*)

### iii.        Function Reports

On April 3, 2019, Ms. Myers completed a function report.  (Tr. 223-30.)  In it, she stated that she stopped working on July 25, 2018 due to scoliosis, DDD of the cervical and lumbar

spine, and chronic pain.  (Tr. 225.)  She was not taking any medications, either prescription or non-prescription.  (Tr. 227.)

Ms. Myers submitted another function report on December 10, 2019. (Tr. 242-48.)  She noted increased pain, decreased mental clarity, more joint instability and decreased tolerance for walking since October 2019.  (Tr. 243.)  Ms. Myers stated she could not sit, stand, or lay down for long.  (Tr. 246.)  With respect to ADLs, Ms. Myers reported her children were responsible for all household chores and her husband started working third shift so he could be home during the day to help her and take her to doctor's appointments.  (*Id.*) Ms. Myers also stated she had been falling due to joint instability and she required help putting on her socks and shoes.  (*Id.*)

### iv.      State Agency Reviewers

On April 29, 2019, state agency reviewing physician Indira Jasti, M.D., reviewed the record and opined that Ms. Myers could perform light work, with the following additional physical functional limitations:

- Frequent climbing of ramps/stairs, balancing, kneeling, crouching, and crawling;

- Occasional climbing of ladders/ropes/scaffolds and stooping;

- Avoid all exposure to hazardous machinery, unprotected heights, and commercial driving.

(Tr. 108-12.)  On October 8, 2019, state agency reviewing physician Elaine Lewis, M.D., reviewed the record and generally concurred with the earlier opinion of Dr. Jasti, stating that the medical evidence reviewed supported the initial findings.  (Tr. 124.)   However, Dr. Lewis opined Ms. Myers had no limitations on balance, could occasionally crouch, but could never climb ladders, ropes, or scaffolds.  (Tr. 123.)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At the October 20, 2020 hearing, Ms. Myers testified that she was unable to work due to back pain and joint pain from Ehlers-Danlos syndrome, a connective tissue disorder.  (Tr. 86-87, 89.)  She lived in a one-story home with her husband and two teenage daughters.  (Tr. 73-74.)  She maintained her driver's license and drove her daughter to work once or twice daily.  (Tr. 73.)  She enjoyed using Shutterfly, but could only work on this hobby for thirty minutes before needing to move around due to pain.  (Tr. 82.)

Ms. Myers stopped working in July 2018 and was terminated due to her restrictions in November 2018.  (Tr. 80-81.)  While still working, Ms. Myers took breaks every hour to hour-and-a-half for ten or twenty minutes at a time.  (Tr. 86.)  Ms. Myers reported walking one or two miles daily for exercise after she stopped working, but stopped walking in the months before the hearing due to increased pain.  (Tr. 81-82.)  Ms. Myers reported having taken Gabapentin and other muscle relaxers and over-the-counter medications for pain management, but reportedly weaned herself off of Gabapentin because she did not receive any benefit.  (Tr. 82, 84.)  She reported she was not taking any medication at the time of the hearing.  (Tr. 82.)  She managed her pain through moving around, using a recliner, taking frequent naps, hot showers, and heating pads.  (Tr. 84.)  Ms. Myers testified she was moving around, standing, and walking back and forth during the hearing.  (Tr. 83.)  She reported difficulty sleeping more than five hours at a time due to pain.  (Tr. 85.)

With regard to past work, Ms. Myers worked as a claims representative at Safelite.  (Tr. 75.)  She experienced difficulty typing due to carpal tunnel syndrome, filed a Worker's Compensation claim, and received an ergonomic keyboard and lifted monitor.  (*Id.*)  She then

worked as a part-time off-site receptionist, account manager, and supervisor.  (Tr. 76.)  In this

position, Ms. Myers set up her desk with accommodations and was able to stand and move

around.  (*Id.*)  She had also worked as a fry cook at Applebee's for twenty five or thirty hours per

week, and as a manager at Bob Evans.  (Tr. 78-80.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified.  (Tr. 90-100.)  The VE testified that the

hypothetical individual of Plaintiff's age, education and work experience and the function

limitations described in the ALJ's RFC determination could perform past work as a claims

representative, receptionist, and recruiter/account manager, and could perform representative

positions in the national economy, including document preparer, patcher, and touch-up screener.

(Tr. 93-96.)  He also testified that if the person would need thirty minute breaks two or three

times per day to lay flat or rest, or was absent more than two days a month, such limitations

would preclude competitive employment.  (Tr. 99-100.)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

the Residual Functional Capacity ("RFC") and vocational factors to perform other work

available in the national economy.  *Id.*

### IV.     The ALJ's Decision

In his November 5, 2020 decision, the ALJ made the following findings:[2]

1.     The claimant last met the insured status requirements of the Social Security
Act on March 31, 2020.  (Tr. 46.)

2.     The claimant has not engaged in substantial gainful activity from the
alleged onset date of July 25, 2018 through the date last insured.  (*Id*.)

3.     The claimant has the following severe impairments: Ehlers-Danlos
syndrome; degenerative disc and joint disease and scoliosis of the spine;
and post laminectomy syndrome/central pain syndrome with
polyarthralgia.  (Tr. 47.)

4.     Through the date last insured, the claimant does not have an impairment or
combination of impairments that meets or medically equals the severity of
the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)

5.     Through the date last insured, the claimant had the residual functional
capacity to lift/carry 10-15 pounds occasionally. She could stand and/or
walk 6 hours out of an 8-hour day and could sit no more than 30 minutes
at a time with 1-2 minutes to change position for a total of up to 6 hours
sitting out of an 8-hour day.  She could frequently climb ramps and stairs,
but would be precluded from climbing ladders, ropes, and scaffolds. The
claimant could frequently balance and occasionally stoop. The claimant
could frequently kneel and occasionally crouch.  The claimant should
avoid exposure to workplace hazards, such as unprotected heights and
dangerous machinery. The claimant should avoid commercial driving. (Tr.
48.)

6.     Through the date last insured, the claimant was able perform past relevant
work as a claims representative; recruiter/account manager; and a
receptionist. (Tr. 57.)

---

[2] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Ms. Myers was not under a disability as defined in the Social Security Act at any time between the alleged onset date of July 25, 2018, through March 31, 2020, the date last insured.  (Tr. 60.)

## V.    Plaintiff's Arguments

Ms. Myers brings one issue for review:

1.    Whether the ALJ's decision that Plaintiff can perform light work is supported by substantial evidence when she failed to properly consider social security ruling ("SSR") 16-3p.[3]  (ECF Doc. 8, p. 1.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[3] Ms. Myers also presents a second argument under the Issues header in her brief: "whether new and material evidence warrants a remand."  (ECF Doc. 8, p. 1.)  However, this argument is not further developed within the brief and is thus deemed waived.  *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ's decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, . . . we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **Assignment of Error: Whether ALJ Failed to Properly Consider SSR 16-3p**

Ms. Myers asserts that the ALJ failed to properly consider SSR 16-3p when forming the RFC, and therefore that the ALJ's decision in her case was not supported by substantial evidence.  (ECF Doc. 8, pp. 1, 11-19.)  The Commissioner argues in response that the ALJ properly considered the evidence, including Ms. Myers' subjective symptom statements, and made a decision supported by substantial evidence.  (ECF Doc. 9, pp. 1, 10-20.)  The Commissioner further contends Ms. Myers is improperly requesting that this Court reweigh the evidence in her favor.  (*Id.* at pp. 1, 16.)

SSR 16-3p sets forth a two-step process for evaluating an individual's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463.  Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  At this stage, the ALJ reviews the objective medical evidence to determine whether the impairment could potentially account for the claimant's alleged symptoms; the ALJ does not evaluate the proportionality of the claimant's statements of pain against the objective medical evidence.  *Id.*

At the second step, the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  When the alleged symptom is pain, the ALJ is directed to evaluate the severity of the alleged pain in light

of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c).  *See Felisky v.*

*Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994).  Factors relevant to symptoms such as pain

include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

SSR 16-3p rescinded and supersedes SSR 96-7p, eliminating "the use of the term

'credibility' from [the SSA's] sub-regulatory policy."  SSR 16-3p, 82 Fed. Reg. 49462, 49463.

The revised regulations clarify "that subjective symptom evaluation is not an examination of an

individual's character."  *Id*.  Rather, when determining "whether an individual's symptoms will

reduce his or her corresponding capacities to perform work-related activities . . . the *consistency*

of the individual's own statements" is considered.  *Id*. at 14170 (emphasis added); *see also Banks*

*v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018)

("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without

reaching the question of overall credibility, or character for truthfulness"), *report and*

*recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

But "an ALJ is not required to accept a claimant's subjective complaints" wholesale. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (evaluating under previous regulations); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) (evaluating under SSR 16-3p); *and* 20 C.F.R. § 404.1529(a);  SSR 16-3p, 82 Fed. Reg. 49462 (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  And, on review, it is not permitted for this Court to make judgments regarding a claimant's statements of their subjective symptoms. Rather, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements" against the record evidence.  *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020).  An ALJ's findings in this regard, when supported by substantial evidence, are to be afforded deference.  *Id.*

Ms. Myers is unpersuasive in her assertion that "the ALJ failed to properly evaluate the factors set forth in SSR 16-3p" or that the ALJ's reasoning – which included observations regarding Ms. Myers appearance, conservative treatment, inconsistent statements, and non-compliance – were not "valid reasons" providing substantial evidence for the decision.  (ECF Doc. 8, p. 13.)  Contrary to Ms. Myers statement that "the ALJ improperly disregards the Plaintiff's complaints of chronic pain," (*id.* at p. 15) the decision as a whole reflects that the ALJ considered Ms. Myers' complaints but did not find her chronic pain disabling.  (*See* Tr. 48-57.)

Excerpted below is a comparison of the SSR 16-3p factors against the ALJ's consideration of Ms. Myers symptoms of pain:

1. Daily activities:

   - "The claimant reported that she enjoys making photobooks on shutterfly as her hobby. However, she reported she was unable to sit in front of the computer for more than 30 minutes." (Tr. 49.)

18

- "The claimant reported bending forward caused increased pain, but despite reports of pain, the claimant continued to perform activities of daily living. The claimant reported she had modified her cleaning from cleaning on her hands and knees to using a swiffer."  (Tr. 51.)

- "The claimant reported she continued to operate a motor vehicle . . . [and] driving locally approximately two times per day."  (Tr. 54.)

2.  The location, duration, frequency, and intensity of pain or other symptoms;

- "Most recently, in December 2019, when evaluated by a rheumatologist, the claimant reported pain with hypermobility of the joints, as well as fatigue and muscle aching."  (Tr. 50.)

- "The claimant reported her back pain was worse than her lower extremity pain."  (*Id.*)

- "During the evaluation [in October 2018] the claimant reported bilateral leg pain and back pain across the low back and into the hips."  (Tr. 51.)

- "During April 2019, the claimant reported changes in her pain symptoms. The claimant reported more right upper thoracic subscapular region pain and demonstrated some increased pain with increased range of motion in the neck. The claimant denied any paresthesias or weakness in the upper extremities and showed no issues with coordination or balance."  (*Id.*)

3.  Factors that precipitate and aggravate the symptoms:

- "she was in greater pain from walking, bending, and lifting."  (Tr. 49.)

- "The claimant reported any activity performed for too long resulted in pain."  (Tr. 50.)

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms:

- "The claimant testified that at the time of her hearing she was not taking medications . . . [but] was previously taking Gabapentin medication.  The claimant stated she is no longer taking the medication because . . . she did not receive benefit from the medication."  (Tr. 49.)

- "The claimant reported that she had tried other medications besides Gabapentin. She reported taking muscle relaxers and anti-inflammatories, including Ultram."  (*Id.*)

5.  Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms:

- "The claimant continued to engage in physical therapy with little improvement."
  (Tr. 50.)

6. Any measures other than treatment an individual uses or has used to relieve pain or
   other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every
   hour, or sleeping on a board):

   - "The claimant reported during her hearing that she was changing positions,
     standing, and walking back and forth."  (Tr. 49)

7. Any other factors concerning an individual's functional limitations and restrictions due
   to pain or other symptoms:

   - "The claimant reported difficulty sleeping and needing naps. The claimant reported
     taking breaks during the course of the day, would miss work due to pain, and noted
     her joints would lock and pop out of place."  (Tr. 49.)

   - "The claimant reported that she would cry after work when she got to her car."  (*Id.*)

The above is not an exhaustive listing of the factors the ALJ considered when evaluating Ms.

Myers' subjective statements of pain.  However, this sample does demonstrate that the ALJ

properly considered the factors described by SSR 16-3p.

Ultimately, the ALJ concluded Ms. Myers' statements of pain were inconsistent with the

objective evidence in the record, explaining her findings in part as follows:

> The record contains inconsistent statements. The claimant reported she stopped
> working due to her reports of pain and cited reduced mobility; however, the record
> documented the claimant continued to walk 1-4 miles per day through October
> 2018 (Exhibit 5F/5). The claimant reported ongoing pain, but denied taking pain
> medications or any medications for her alleged conditions. The claimant reported
> her medications were ineffective; however, the claimant declined to purs[u]e
> greater treatment modalities, such as undergoing spinal injection (Exhibit 4F/23;
> 5F/67). While the claimant reported concentration deficits associated with her
> physical reports of pain, it should be noted the claimant testified she continued to
> operate a motor vehicle and research her pain. Driving a motor vehicle and
> engaging in research require significant and sustained attention and concentration
> and driving requires a simultaneous application of membered information. While
> the claimant reported her treatment was limited due to a lapse in insurance
> coverage, the claimant did not purs[u]e additional modalities when she was covered
> by her insurance provider. Further, while she reported widespread pain, the record
> was devoid of any recurrent emergent treatment due to symptom exacerbation or
> pain described as intractable. The claimant reported difficulty sleeping, but the

record supported she was obtaining at least five hours of sleep per night. The
claimant reported needing to take naps at [the] hearing, but the record was devoid
of any recurrent reports of fatigue resulting in naps to medical providers. While the
claimant reported ongoing joint instability and pain, the record documented no
more than minimal spinal degeneration with a history of scoliosis. The claimant
reported numbness and tingling, but EMG testing was negative. Further, imaging
showed no nerve compression. The claimant reported that her joints would lock and
move out of place; however, the claimant was not afforded any assistive devices or
ambulatory aids. While joint subluxation was noted in the record, the record did not
support any emergent treatment for joint locking or instability. While the claimant
reported continued joint and back pain, it should be noted the most recent testing
from December 2019 evidenced 5/5 strength throughout and a normal gait. The
claimant exhibited no joint synovitis and other than some wrist tenderness, her
joints were not observed to be swollen, tender, or limited in mobility.

(Tr. 54-55.)  These and other findings in the ALJ decision demonstrate that the ALJ weighed Ms.

Myers' subjective complaints of pain against the objective medical evidence and found the

claimed level of limitation was not supported by the whole record.  As the ALJ explained:

> [T]he pivotal question is not whether such symptoms exist, but whether those
> symptoms occur with such frequency, duration, or severity as to reduce the
> claimant's residual functional capacity as set forth above or to preclude all work
> activity on a continuing and regular basis. In this case, a careful review of the record
> does not document sufficient objective medical evidence to substantiate the severity
> of the pain and degree of functional limitations alleged.

(Tr. 53.)  Moreover, even though the ALJ determined that Ms. Myers' subjective symptom

statements were inconsistent with the record, she still incorporated additional limitations into the

RFC, such as limitations in lifting/carrying, balance, climbing, workplace hazards, and providing

a sit/stand option.  (Tr. 56-57.)

For the reasons stated above, the undersigned concludes that Ms. Myers has not met her

burden to demonstrate that the ALJ failed to properly consider her subjective symptoms in

accordance with SSR 16-3p.  Rather, a review of the ALJ's decision reveals that she considered

the appropriate factors and made a decision supported by substantial evidence.  Ms. Myers'

arguments to the contrary are unpersuasive, and ultimately amount to a request that this Court undertake an impermissible reweighing of the evidence.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

December 2, 2022

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).